In re SUSQUEHANNA ROOFING CO.

(District Court, M. D. Pennsylvania.   September 18, 1909.)

No. 1,255, in Bankruptcy.

BANKRUPTCY (§ 140*) — OWNERSHIP OF PROPERTY — CONVERTED BY TRUSTEE — LIABILITY OF ESTATE THEREFOR.

In a controversy between a trustee in bankruptcy for a roofing company and a claimant as to the ownership of certain roofing felt that had been sold by the trustee as that of the bankrupt, but was alleged by claimant to have been a part of a car load which he had sent to the bankrupt to be tarred, the evidence *held* to support the contention of the claimant, and to entitle him to recover the value from the estate.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

In Bankruptcy.   Sur petition of William Hughes for reclamation of certain property.

W. E. Benjamin and C. A. Hawkins, for claimant.
George E. Neff and C. A. May, for trustee.

ARCHBALD, District Judge.   This case is purely one of fact.   In the fall of 1907 William Hughes, the present claimant, shipped to the plant of the bankrupt company a car load of dry felt in rolls to be saturated with tar for roofing purposes, and, after treatment, to be reshipped to customers upon his orders.   The dry weight was 31,435 pounds, which was increased to 56,894 pounds upon being treated.   Of this, 18,110 pounds, tarred weight, was shipped away on orders of Hughes prior to bankruptcy, and 8,263 pounds, admittedly on hand, was turned over to him by order of the referee afterwards.   This leaves 30,521 pounds to be accounted for, which is the amount in controversy. If this was on hand at the works when the company went into bankruptcy, in addition to that which was turned over, having been disposed of by the trustee, the estate must respond for it; but if, as contended by the trustee, it was shipped off by the company, before that, to fill its own orders, there is nothing but the ordinary liability on account of it.   The referee took the latter view, and this is an appeal from his decision.

Having seen the witnesses, the referee is supposed to be in a better position to pass on their testimony, and his findings are therefore to be respected accordingly.   But after a careful study of the case, and the reasons given by him for his decision, I cannot resist the conclusion that a mistake has been made in the disposition of it.   The case

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

turns on the identity of the Hughes felt with the piles of material in the yard, when the receiver, who is now the trustee, took possession, to wit, a large pile near the end of the tar plant, and two smaller ones out by the siding. That the two smaller ones were his is conceded, this being what the referee ordered to be turned over. But the large pile is claimed by the trustee to have been material that he himself manufactured, after he took charge as receiver. And the referee accepts this. It may be that he meant merely that it was manufactured by the company at the mill, and left there. But that is not what he says. Nor does the referee so understand him. "Mr. Kopp, positively testified," as the referee finds, "that the third pile of felt, which Mr. Eastlack identified as Hughes' felt, was in point of fact not Hughes' felt at all, but that he (Kopp), as receiver, made it in the mill, and had it piled up in the yard, after the filing of the petition in bankruptcy and while he was acting as receiver. And in this Mr. Kopp is supported by the testimony of Strine, Grissinger, and Willis." If that was true, the evidence was all in the trustee's hands, and it would have been easy for him to have proved it. But the fact is that, except his mere say-so, there is not a particle of evidence to sustain it. And if the case is to be disposed of upon any such theory, there can be but one result to it. That there was a pile there, at the time of his appointment, there can be no question. Eastlack, the general manager, and Spahr, the secretary and treasury, both of whom were actively engaged in directing the business, so testified, as does Grissinger, one of the workmen, if, indeed, Mr. Kopp himself does not in the end admit it. Except the statement of Willis, another workman, that he does not know of any felt piled at the end of the tar plant, there is nothing to the contrary. It could not thus have been made by the receiver. The only thing that can be said is that, if not shown to belong to Hughes, it must have been made by the company.

But that it was made by the company is not much better supported. It was expressly testified by both Eastlack and Spahr that the car of felt sent there by Hughes in the latter part of 1907, to be saturated, was set out in the yard, after it had been treated, in three piles, to await shipping orders—one large pile, the second from the end of the tar plant, and two smaller ones, further out in the yard, by the color house or siding, all of which were there when the receiver took possession, only the two smaller ones being left, when the matter came to be looked up afterwards. This is strong evidence, coming from those most likely to know, and charged with the duty of doing so, and is not to be lightly disregarded. Opposed to it is the testimony of Strine, who did the loading and shipping, Grissinger and Willis, who were saturators, and Warfel, the bookkeeper, who in substance say that some time in the latter part of 1907 a car of felt was shipped to the mill to be tarred, which was designated by Eastlack at the time as "Ben's" or "Munn-Price" goods, and afterwards, as belonging to Hughes, the present claimant; the Munn-Price Company being a New York concern which failed just about the time it came there. This felt, as they testify, as soon as it was saturated, was piled up, partly in the mill and partly in the yard, where two piles of it were made beside the

color house or siding, that in the mill being almost immediately shipped out to fill certain of the company's own orders. They know of no such third pile as is spoken of by Eastlack and Spahr, at the end of the tar plant; Grissinger stating that the one he saw there was made by the company, which is the only direct evidence of any one on this subject.

It is not easy, on their face, to reconcile these conflicting stories. But if one is to be taken rather than the other, that of Eastlack and Spahr would seem to be much the more reliable; it being their business to know about and look after this material, the others only knowing about it casually, and having to fall back upon Eastlack and Spahr in the main for their information. In several particulars, also, the testimony of Strine and the others is open to question. It is left very indefinite, for instance, just how much of the Hughes felt was shipped, as they say, from the mill, directly after being tarred; it being variously given "as a car load" (there was only a car load in all, as I understand it), "600 or 700 rolls," "less than half a car load," and "different little shipments of less than car load lots." It was also stated to Vetter by Strine that there was only one load of 800 pounds which was shipped off that he knew of, which statement he now virtually admits. The little so shipped out of the mill, according to the lower of these estimates, hardly accounts for the missing 30,000 pounds, while the larger amounts are not consistent with there being two big piles in the yard, of 600 or 700 rolls each, as testified by Strine, or 500 or 600 each, according to Grissinger, which, at 40 pounds to the roll, would amount to anywhere from 40,000 to 56,000 pounds, or practically the whole quantity that came to be tarred. As calling in question, also, the statement that a part of these goods were shipped out immediately after they were treated, it is shown that, if this were done, there would be danger of spontaneous combustion.

But, without dwelling upon these points, it is evident to my mind that the confusion in the testimony arises because the parties are speaking of different goods. There was more than one load of so-called Munn-Price felt, in other words, which came that year to the mill to be tarred. It is true that some of the witnesses say they knew of but one. But it is testified by Vetter, Mr. Hughes' representative, that two or three cars were shipped there by Hughes, for the account of the Munn-Price Company, before the one in controversy. And it is admitted by Warfel, the bookkeeper, that other Munn-Price felt came there that year. Previous shipments, moreover, were of soft felt, where the one in question was hard. There is some dispute over this; Exhibits 4 and 5, where a record of it was made, apparently designating it as soft, and Kopp also testifying that that was the character of what he saw in the two smaller piles in the yard. But the saturation is conclusive that it was hard; 31,435 pounds, dry weight, becoming 56,894 pounds when treated; which, as I make it, is a gain of about 86 per cent. by absorption. If it were soft, it would have taken up at least 120 per cent. Kopp may very well have been mistaken about it, judging, as he did, only from outward appearances; it being put up, like soft felt, in 40-pound rolls, the standard weight

at that factory. Willis also says that the felt about which he testifies, which is supposed to be the same as that spoken of by the others, was single-ply felt, which is only used for soft and not hard goods. And Strine admits that after the soft Munn-Price felt, of which he speaks, the company got hard felt from outside parties to be saturated, which might thus have been that which is here in controversy.

It is said that all the witnesses for the trustee identified the car of Munn-Price goods, a part of which was shipped from the mill, with the small piles out in the yard, which are now claimed as belonging to Hughes, and that this is also tied up to that which came in the latter part of 1907, that being the time of the Munn-Price Company's failure. But, with even more positiveness, these goods, as has just been pointed out, are identified as soft felt goods, which those in controversy were not, and the one must give way to the other. And it being established that there were different Munn-Price shipments of different kinds of felt, to which the observations of the witnesses might equally apply, the chance for confusion appears, and with it the opportunity to reconcile the testimony, otherwise conflicting.

Accepting, then, the statement that there was Munn-Price felt, which was shipped away to help out orders which there was not enough company felt on hand to fill, as testified to by Strine and the others, this being soft felt, and not hard, it may well be, as testified by Eastlack and Spahr, who certainly ought to know, and whose testimony under the circumstances is to be taken, that other Munn-Price felt belonging to Hughes was piled up in the yard, in the way described, which was there, to the extent claimed, at the time the receiver went in; and this having been subsequently disposed of by him, with the idea, no doubt, that it was made at the mill, that being the only information he had with regard to it, it must now be accounted for accordingly.

It is contended that, even if the goods were converted by the company, and not by the receiver or trustee, being held on bailment, the same right to recover for them would exist. Bills v. Schliep, 11 Am. Bankr. Rep. 607, 127 Fed. 103, 62 C. C. A. 103. But, without passing upon that, the case being otherwise disposed of, the petition is sustained, the order of the referee reversed, and the case sent back, with directions to allow the claim.